UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Office of the Public Guardian

      v.                                                  Civil No. 21-cv-705-LM
                                                    Opinion No. 2022 DNH 115 P

Elliot Hospital, et al.

**O R D E R**

The Office of the Public Guardian, in its capacity as guardian of Seth
Brunelle, sues defendants Elliot Hospital and Joey Scollan, Doctor of Osteopathic
Medicine, (the "Elliot Defendants") and Hillsborough County.  Against the Elliot
Defendants, the Guardian brings claims under 42 U.S.C. § 1983 for violations of the
First, Eighth, and Fourteenth Amendments and medical malpractice claims under
New Hampshire law.[1]  Prior to the close of discovery, the Elliot Defendants move for
summary judgment.  Doc. no. 12.  They argue that they are not liable under § 1983
because they did not act under color of state law, and that, absent the § 1983 claims,
the court lacks supplemental jurisdiction over the state-law claims.  The Guardian

---

[1] On September 8, 2022, the court granted the Guardian's motion to amend
the complaint.  The Guardian filed that motion after the Elliot Defendants moved
for summary judgment.  The amended complaint differs from the original complaint
only in that it: (1) includes additional allegations related to defendant Hillsborough
County's policies; and (2) withdraws the Guardian's § 1983 claims under the First
and Eighth Amendments against Hillsborough County.  The Elliot Defendants did
not object to the motion to amend.  Nor have they argued that the changes in the
amended complaint have any bearing on their motion for summary judgment.

objects.  For the following reasons, the court denies the motion without prejudice as to the Fourteenth Amendment claims to allow the Guardian additional time to complete discovery, denies the motion without prejudice as to the medical malpractice claims, and grants the motion as to the First and Eighth Amendment claims.

## STANDARD OF REVIEW

Summary judgment is proper only if the moving party can demonstrate that there is no evidence in the record to support a judgment for the nonmoving party. Borges v. Serrano-Isern, 605 F.3d 1, 5, 8 (1st Cir. 2010); see also Fed. R. Civ. P. 56(a).  If the moving party succeeds in making that showing, "the burden shifts to the nonmoving party, who must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor." Borges, 605 F.3d at 5.  In evaluating a motion for summary judgment, the courts must view the evidence in the light most favorable to the nonmoving party, must draw all reasonable inferences in that party's favor, and may neither make credibility determinations nor weigh the evidence.  Harris v. Scarcelli, 835 F.3d 24, 29 (1st Cir. 2016); Hicks v. Johnson, 755 F.3d 738, 743 (1st Cir. 2014).

# BACKGROUND[2]

Brunelle has a longstanding history of psychiatric and substance abuse issues with numerous hospitalizations for mania, psychosis, catatonia, and physically aggressive behavior.  Brunelle's medical providers treated him over the years with a variety of prescription medications.  In addition, starting at least eight years before the summer of 2018, Brunelle's medical providers treated him using electroconvulsive therapy.  At the time of the events giving rise to this case, Brunelle was receiving electroconvulsive therapy treatment on a weekly basis.  Both medications and electroconvulsive therapy were necessary for managing Brunelle's mental health issues.

On May 23, 2018, Brunelle was an inpatient in the psychiatric unit of Elliot Hospital.  On that day, an officer with the Manchester Police Department, which maintains a detail at Elliot Hospital, responded to a complaint that Brunelle had physically assaulted security personnel at the hospital.  The officer arrested Brunelle, and he was subsequently charged with four counts of assault.  Brunelle

---

[2] For the purposes of their motion for summary judgment, the Elliot Defendants stipulated to all the factual allegations in the complaint.  The court therefore accepts the allegations in the complaint as true for the purposes of this order.  See In re Durability Inc., 212 F.3d 551, 555 (10th Cir. 2000) ("Generally, on motions for summary judgment, courts regard stipulations of fact as admissions of the parties that are conclusive without further evidentiary support in the record."). While the court has granted the Guardian's motion to amend the complaint, the parties do not argue that the additional allegations affect the motion for summary judgment and the court does not relay them in this order.  In addition to the allegations, the court has also considered the affidavits and documentary evidence the parties attached to their briefs.  Consistent with the summary judgment standard, the court considers the facts in the light most favorable to the Guardian.

was apparently brought to the Hillsborough County House of Corrections—known as Valley Street Jail—after his arrest.

The following day, the New Hampshire Circuit Court issued a bail order. The Circuit Court ordered police officers to transport Brunelle from Valley Street Jail to the New Hampshire State Hospital for an evaluation and admission. The order stated that, upon admission to the State Hospital, Brunelle was to remain there until hospital staff determined it was appropriate to discharge him. The bail order directed Brunelle to comply with all treatment and testing recommendations, including taking all prescribed medications and submitting to diagnostic testing. The bail order added that Brunelle would be held on $1,000 personal recognizance for the duration of his stay at the State Hospital. Finally, the bail order provided that, if the State Hospital discharged Brunelle, his personal recognizance bail would immediately convert to $1,000 cash bail.

About a week and a half into his stay, the State Hospital and Brunelle's parents, who were his legal guardians at the time, began discussing a conditional discharge from the State Hospital and a transfer to Westbridge, a residential treatment facility in Manchester. See RSA 135-C:50 (authorizing administrators of facilities holding involuntarily committed individuals, such as the State Hospital, to discharge those individuals subject to specified conditions, including ongoing out-patient treatment at community mental health programs or transitional housing programs). They also established a contingency plan if Brunelle became symptomatic while at Westbridge. Under this plan, Brunelle's parents were to take him to the emergency room and initiate an involuntary emergency admission so he

4

could receive mental health treatment.  See RSA 135-C:27-28 (establishing a procedure for individuals to petition for involuntary emergency admissions to the State Hospital).  Next, Brunelle's parents and State Hospital staff would determine whether to initiate a temporary revocation of the conditional discharge and, if necessary, place him on the wait list for readmission to the State Hospital.  See RSA 135-C:51 (establishing a procedure for revoking an individual's conditional discharge if they violate the terms of their conditional discharge).

About a month and a half after his admission—on July 10—Brunelle moved to amend his bail conditions to facilitate the State Hospital's decision to conditionally discharge him to Westbridge.  The motion sought to continue his personal recognize bail while he remained at Westbridge.  The Circuit Court approved the motion on July 13, stating that "should [Brunelle] leave or otherwise be unsuccessfully discharged from Westbridge . . . then bail shall immediately convert to $1,000 [cash bail]."  Doc. no. 16-1.  The State Hospital subsequently conditionally discharged Brunelle, although the record does not reveal the terms of his conditional discharge.

Westbridge admitted Brunelle on July 19.  Brunelle, however, refused to take his medication when he arrived.  On July 24, Brunelle's mother Barbara arrived at Westbridge to bring him to Concord Hospital for an electroconvulsive therapy appointment.  When she arrived, Brunelle stared straight ahead, paced, and held his arm in the air.  Barbara had previously seen Brunelle exhibit this behavior and knew it was symptomatic of his illness.  Brunelle refused to go to his electroconvulsive therapy appointment that morning.

5

Barbara conferred with Brunelle's father and Westbridge staff.  Together, they decided that Brunelle was likely decompensating[3] and should go to the Elliot Hospital emergency room for an evaluation.  Westbridge discharged him from its facility, and Brunelle was brought to the emergency room by ambulance.  His parents traveled separately.  When his parents arrived at the emergency room, Barbara told hospital staff she was Brunelle's guardian and that Brunelle was at the emergency room for a mental health evaluation and possible readmission to the State Hospital.  Consistent with their contingency plan with the State Hospital, Brunelle's parents completed a petition for involuntary emergency admission to the State Hospital and submitted it to hospital staff.  See RSA 135-C:27-28.

The medical notes from his stay in the emergency room show that Brunelle was, for the most part, calm.  However, he was occasionally unresponsive, agitated, and confrontational, and he exhibited several concerning behaviors.  For example, he refused to take his medication or undergo electroconvulsive therapy.  And, after hospital staff gave Brunelle a cup to procure a urine sample, he urinated into the cup and then drank the urine.  At one point, Brunelle attempted to leave the hospital through the ambulance entrance, only to be returned to his room by nursing staff.  For most of his stay in the emergency room, Manchester police stood outside his door.

---

[3] In this context, "decompensating" means "[t]he appearance or exacerbation of a mental disorder due to failure of defense mechanisms."  Decompensation, Stedman's Med. Dictionary (2014).

An involuntary emergency admission requires a psychological evaluation. See RSA 135-C:28.  In the early evening of July 24, Carmen Bertran, a social worker at Elliot Hospital, evaluated the petition for involuntary admission.  She concluded that Brunelle did not meet the criteria for involuntary emergency admission.  See id.  Bertran decided to discharge Brunelle from Elliot Hospital and informed his parents of that decision.

Brunelle's parents objected to his discharge because they feared he would be a danger to himself and others, but they were also concerned about the potential legal ramifications if he were discharged.  Specifically, Barbara believed that if Brunelle were discharged from the emergency room, his $1,000 cash bail would go into effect pursuant to the July 13 bail order.  And Barbara feared that if Brunelle were discharged, he would either (1) be arrested and brought to jail without her or her husband knowing or (2) he would not be arrested and potentially harm himself or others.

Believing it was her obligation as Brunelle's legal guardian, Barbara told Officer Christopher Day, a Manchester police officer stationed at Elliot Hospital, about Brunelle's bail conditions and that Elliot Hospital was planning to discharge him.  Barbara hoped that Officer Day would help ensure Brunelle continued to comply with the bail order and receive medical treatment.

After Barbara talked with Officer Day, she and her husband continued to raise objections to Brunelle's discharge with Bertran.  They told Bertran that their plan with the State Hospital was to readmit Brunelle if he became symptomatic while at Westbridge.  Bertran ultimately decided that she needed more guidance.

7

Specifically, she noted that although the State Hospital conditionally discharged him to Westbridge, no one seemed responsible for his care after Westbridge discharged him.  Accordingly, Bertran decided to keep Brunelle admitted in the emergency room until the morning so that he could undergo a new evaluation for involuntary emergency admission with a psychiatrist.  After receiving Bertran's assurance that Brunelle would remain in the emergency room until the following morning, his parents returned home from the hospital at some time between 10:30 and 11 pm.  However, it does not appear that anyone told Officer Day that Bertran had decided to keep Brunelle admitted to the hospital.

After Barbara spoke to him, Officer Day reviewed Brunelle's bail conditions. According to his report about the incident, he first confirmed with an unidentified "mental health clinician" that Brunelle did not meet the criteria for involuntary emergency admission and that hospital staff were preparing to discharge Brunelle. After speaking with hospital staff, Officer Day spoke with his supervisor.  According to the police report, the two: "had the conditions [of Brunelle's bail order] pulled and the information provided by Barbara turned out to be correct.  The decision was made because of this that [Brunelle] would be placed into custody and transported back to Valley Street Jail and held on the $1,000 Cash/ Surety Bail."  Doc. no. 12-2 at 5.

Despite Bertran's decision to keep Brunelle at Elliot Hospital overnight, at 10:19 pm, defendant Dr. Joey Scollan, an Elliot Hospital employee, recorded the following note:

> Patient records were being reviewed, and it was discovered that
> [Brunelle] revocated a conditional discharge. He is therefore under
> arrest and can receive mental health care where he is going. Discharged
> from the emergency department with medical clearance.

Doc. no. 16-3.

About 30 minutes after Dr. Scollan recorded this note, at around 10:45 pm,
Officer Day arrested Brunelle and transported him to Valley Street Jail. At
approximately 11:45 pm, the Manchester Police Department left a voicemail with
Brunelle's parents stating that Brunelle had been transferred to Valley Street Jail.
After Brunelle's parents called the jail, they learned that Elliot Hospital did not
provide Brunelle's medications to the jail staff or otherwise inform them about
Brunelle's medical needs. Brunelle's parents told the jail about Brunelle's condition
that evening and provided his medication the following morning. Brunelle
remained at Valley Street Jail for several weeks before he was admitted to the State
Hospital.

The Guardian then filed this lawsuit on behalf of Brunelle. It brings three
separate § 1983 claims against the Elliot Defendants on the grounds that their
treatment of him violated Brunelle's First, Eighth, and Fourteenth Amendment
rights,[4] and it brings a state-law negligence claim for medical malpractice for
discharging Brunelle to police custody under these circumstances. In addition,
although it is not at issue in this motion, the Guardian brings a § 1983 claim
against Hillsborough County on the ground it failed to provide adequate medical

---

[4] Notably, the Guardian does not allege a violation of Brunelle's Fourth
Amendment rights stemming from Brunelle's arrest.

care to Brunelle while he was housed at Valley Street Jail in violation of the

Fourteenth Amendment.[5]

## DISCUSSION

The Elliot Defendants first move for summary judgment on the § 1983 claims

under the First, Eighth, and Fourteenth Amendments, arguing that they are not

state actors and therefore cannot be liable for constitutional violations.  The Elliot

Defendants next assert that, if the court grants their summary judgment motion as

to the constitutional claims, the court lacks supplemental jurisdiction over the

state-law medical malpractice claims.  The court addresses these arguments below.

I.   <u>Section 1983 claims</u>

The court addresses each of the § 1983 claims separately.  Because only the

Fourteenth Amendment claims are arguably colorable, the court first addresses

those before moving to the claims under the First and Eighth Amendments.

A.   <u>Fourteenth Amendment</u>

The Guardian claims that the Elliot Defendants violated Brunelle's

Fourteenth Amendment rights because Dr. Scollan conspired and coordinated with

the Manchester police to arrest Brunelle and remove him from the emergency room,

which resulted in his detention and failure to receive medical care at Valley Street

_____

[5] As noted above, the Guardian originally alleged claims under the First and
Eighth Amendments against Hillsborough County.  <u>See</u> <u>supra</u> at note 1.  It
withdrew those claims, however, in its amended complaint.  <u>Id.</u>

Jail.  The Guardian alleges that Dr. Scollan either knew, or should have known, that Brunelle would not receive medical care if he was discharged from the emergency room.  Although the Guardian has not said so explicitly, the court presumes the claim is that these actions violated Brunelle's substantive due process rights under the Fourteenth Amendment.  See Cnty. of Sacramento v. Lewis, 523 U.S. 833, 840 (1998).

The Elliot Defendants move for summary judgment on the § 1983 claims under the Fourteenth Amendment on the sole ground that the statute does not apply to them because they are not state actors and there are no facts suggesting they acted under color of state law.  In response, the Guardian argues that the Elliot Defendants did act under color of state law because they agreed with the police to arrest Brunelle and remove him from the emergency room.  The Guardian further argues that discovery has not closed in this case, and that the Guardian requires additional discovery to develop its claim that the Elliot Defendants were involved in the decision to arrest Brunelle and remove him from the emergency room.  See Fed. R. Civ. P. 56(d).

To recover under § 1983, a plaintiff must prove that the defendant, acting under color of state law, deprived the plaintiff of a right or privilege guaranteed under the United States Constitution or federal law.  42 U.S.C. § 1983.  Private parties acting in their individual capacities are not ordinarily acting under color of state law and are thus not generally liable under § 1983.  Estades-Negroni v. CPC Hosp. San Juan Capestrano, 412 F.3d 1, 4 (1st Cir. 2005).  There are, however,

certain circumstances in which a private individual may be liable under § 1983. Id.[6] As is relevant here, private parties may be liable as state actors when they "[are] willful participant[s] in joint activity with the State or its agents." See Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 (1970). A plaintiff can show evidence of joint activity by "plan, prearrangement, conspiracy, custom, or policy . . . ." Alexis v. McDonald's Rests. of Mass., Inc., 67 F.3d 341, 351 (1st Cir. 1995).

The question of whether a private individual jointly participated in state action is highly fact-based. Lugar v. Edmondson Oil Co., 457 U.S. 922, 939 (1982). In considering whether a private party was a state actor based on an agreement or plan with a state agent, courts have generally looked to whether the private party engaged in a conspiracy with the stage agent. See Dennis v. Sparks, 449 U.S. 24, 29 (1980) (holding that individuals who conspired with state judge to unlawfully deprive plaintiff of his property by judicial order acted under color state law); see also Adickes, 389 U.S. at 150-52; Alexis, 67 F.3d at 351; Earle v. Benoit, 850 F.2d 836, 844 (1st Cir. 1988).

To establish civil conspiracy against a private party, a plaintiff must show: (1) that the defendant, together with at least one other party who was a state agent, willfully agreed to inflict a wrong or injury upon the plaintiff; (2) that one of the conspirators made an overt act in furtherance of the conspiracy; and (3) that the

---

[6] The First Circuit has also recognized the "public function" and "state compulsion" tests to decide if a private party has acted under color of state law. Estades-Negroni, 412 F.3d at 4. The Guardian does not argue that either test applies in this case.

overt act caused the plaintiff to suffer a constitutional deprivation.  Earle, 850 F.2d at 844; Adickes, 389 U.S. at 152.

To establish the first element of a conspiracy, there must be an agreement or a "meeting of the minds" between the private defendant and a state agent to violate the plaintiff's constitutional rights.  Adickes, 389 U.S. at 158.  For this reason, a private defendant's mere knowledge, acceptance, or approval of the state's tortious actions does not make him a participant in a conspiracy.  See Diaz-Garcia v. Surillo-Ruiz, 113 F. Supp.3d 494, 515 (D.P.R 2015) (finding that defendants were not conspirators where they knew of state agent's tortious actions and refused to intervene to stop them).  Rather, there must be evidence that the defendant was a willful participant in the conspiracy.  Adickes, 389 U.S. at 158.

Because defendants are unlikely to admit that they conspired against a plaintiff, evidence of an agreement will often implicate evidence of the second element—that either the private defendant or the state agent harmed the plaintiff in furtherance of the conspiracy.  See id. at 157.  Even so, the circumstantial evidence must be sufficient to establish that the defendants acted pursuant to an agreement between themselves.  A private party does not become a state actor merely because he wants the state to act against the plaintiff, even if he initiates or encourages the state to take action that harmed the plaintiff by, for example, filing a police report.  See Wagenmann v. Adams, 829 F.2d 196, 210 (1st Cir. 1987) (noting that private individual who files a complaint against plaintiff in good faith does not become liable under § 1983 for the police's subsequent actions that deprive plaintiff of his constitutional rights); Alexis, 67 F.3d at 351-52 (holding that McDonald's

manager who called police officer into a restaurant and encouraged him to remove plaintiff did not jointly participate in the plaintiff's unlawful arrest).

Rather, there must be some evidence that the private party acted pursuant to a conspiracy. For example, in <u>Adickes</u>, the plaintiff, a white teacher, claimed that a private store conspired with Hattiesburg, Mississippi, police officers to deny her service because she was in the company of black students. <u>Id.</u> at 154-58. After she left the store, the police arrested her for "disturbing the peace." <u>Id.</u> The plaintiff acknowledged that she had no direct evidence of an agreement between the police and the store. <u>Id.</u> at 156-57. However, she introduced evidence that there was a police officer in the store at the time she was refused service and that this same officer arrested her. <u>Id.</u> She also introduced evidence that the atmosphere in the store was tense at the time she was refused service as a potential motive for the officer's actions. <u>Id.</u> at 157.

She argued that, even in the absence of evidence of a direct agreement, the sequence of events created a substantial enough possibility of a conspiracy to allow the claim to proceed to trial—particularly because non-circumstantial evidence could only come from adverse witnesses. <u>Id.</u> The Supreme Court agreed. It concluded that: "If a policeman were present, we think it would be open to a jury, in light of the sequence that followed, to infer from the circumstances that the policeman and [store] had a 'meeting of the minds' and thus reached an understanding that petitioner should be refused service." <u>Id.</u> at 158.

Where the overt act is committed by the state agent, and not the private defendant, establishing that the state agent acted pursuant to an agreement

14

requires evidence that he essentially "substitut[ed] the judgment of a private party for that of the [state agent] or allow[ed] the private party to exercise state power." Alexis, 67 F.3d at 351-52. For example, in Wagenmann, the First Circuit concluded that the defendant acted under color of state law. 829 F.2d at 209-11. In that case, the defendant was a prominent resident of Worcester, Massachusetts, and had a tumultuous relationship with the plaintiff, whose estranged daughter was set to marry the defendant's son. Id. at 201-02. When the plaintiff arrived in Worcester the weekend of the wedding, the local police arrested and held him on flimsy grounds. Id. at 202-05.

There was circumstantial evidence in that case that the defendant wanted the police to arrest the plaintiff to prevent him from interrupting the ceremony, evidence that the defendant contacted the deputy police chief on his personal phone, and testimony from the police officers who arrested the plaintiff that they consulted with the defendant and mutually decided to arrest and detain the plaintiff for the purpose of preventing him from interrupting the wedding. Id. at 209-11. The First Circuit concluded that these facts were sufficient to establish that the defendant willfully conspired with state actors to deprive the plaintiff of his constitutional rights by arresting and detaining him on illegitimate grounds. Id. at 209.

In this case, the Elliot Defendants have moved for summary judgment prior to the close of discovery. The allegations in the complaint and the limited evidence in the record, construed in a light most favorable to the Guardian, are sufficient at this early stage to permit the Fourteenth Amendment claims to go forward for discovery. The limited record shows that Bertran had previously made a decision to

keep Brunelle overnight for evaluation.  Dr. Scollan reversed course but without mentioning Bertran's earlier decision and with a note that suggested Brunelle was "under arrest": "He is therefore under arrest and can receive mental health care where he is going.  Discharged from the emergency department with medical clearance."  Doc. no. 16-3.  It is not clear where Dr. Scollan learned this information, but it is not unreasonable to infer she spoke with Officer Day.  Further, Elliot Hospital had some motive for wanting to remove Brunelle from the emergency room, given his erratic behavior and his prior assault on its staff.  In other words, it is not absurd that hospital staff would reach an agreement to have police remove Brunelle from the emergency room.  See Wagenmann, 829 F.2d at 210 (holding that private defendant could be liable for plaintiff's arrest where there was evidence he desired the plaintiff to be arrested and influenced state actors to do so on unlawful grounds).  This evidence creates a factual basis—even if weak at this early stage— supporting Brunelle's theory that the Elliot Defendants reached an agreement with Officer Day to arrest Brunelle and remove him from the emergency room.

Discovery has not closed in this case and the Guardian argues that it requires additional time to explore Officer Day's police report and Dr. Scollan's role in Brunelle's arrest and removal from the emergency room.  Under Rule 56(d), parties opposing summary judgment may defeat the motion if they (1) present a plausible basis for why facts that might be ascertainable through discovery within a reasonable time will influence the outcome of the summary judgment motion; and (2) explain their current inability to adduce those facts.  Fed. R. Civ. P. 56(d);

*Rivera-Almodovar v. Instituto Socioeconomico Comunitario, Inc.*, 730 F.3d 23, 28 (1st Cir. 2013).[7]

As to the first element, the Guardian has shown that reasonable additional discovery efforts could yield evidence that would influence the outcome of the summary judgment motion.  Information about the parties' actions and motivations is likely discoverable in this case and would be highly relevant to the Guardian's claims.  The Guardian should have an opportunity to pursue this discovery.  This is particularly true where determinations about joint-participation are so heavily fact-based, *Lugar*, 457 U.S. at 939, the relevant facts likely relate to adverse parties' knowledge and motivations, and the Guardian does not appear to have deposed or submitted interrogatories to these individuals.

As to the second element, Brunelle's reason for failing to produce this evidence, the court notes that discovery in this case has not closed.  At the time the Elliot Defendants filed this motion for summary judgment, the deadline for the

---

[7] Rule 56(d) is not self-executing.  *Rivera-Almodovar*, 730 F.3d at 28.  To invoke its benefit, a party must by affidavit or some other authoritative manner, provide the requisite information.  *Id.*  That said, "[b]ecause district courts construe motions that invoke the rule generously, holding parties to the rule's spirit rather than its letter, the First Circuit requires substantial, not perfect, compliance." *Karmue v. Remington*, No. 17-CV-107-LM-AKJ, 2020 WL 1290605, at *11 (D.R.I. Mar. 18, 2020) (quoting *Nelson v. Formed Fiber Techs., Inc.*, 856 F. Supp. 2d 235, 237 (D. Me. 2012)).  Here, the Guardian did not cite Rule 56(d) nor submit a separate affidavit or a declaration.  It did, however, explain in its opposition memorandum why it required additional discovery and what additional avenues of discovery it intended to pursue.  Construed generously, *see Karmue*, 2020 WL 1290605, at *11, the court finds this sufficient to invoke Rule 56(d).

completion of discovery was not until early 2023.[8]  The court fails to see why the Guardian should be faulted for failing to complete discovery before the parties' agreed-to date.  For these reasons, the Guardian should be given more time to conduct discovery on these issues under Rule 56(d).  The Elliot Defendants' motion is therefore premature, and the court denies it without prejudice.

In contesting that discovery would be helpful in this case, the Elliot Defendants argue that the evidence in the record conclusively demonstrates that Dr. Scollan was not involved in the decision to arrest and remove Brunelle because (1) Barbara informed Officer Day that Brunelle would be in violation of his bail conditions if he was discharged; (2) Officer Day appears to have relied on this information, and his discussion with his supervisor, in deciding to arrest Brunelle; and (3) he does not mention Dr. Scollan at all in his report.  This evidence is not dispositive, however.  First, Officer Day's report is vague and largely written in passive voice, making it difficult to understand who is taking the actions and making the statements he discusses in the report.  Second, the report is not a comprehensive accounting of everything that happened with respect to Brunelle's time in the emergency room, and there is nothing in the report that forecloses the possibility that the officer discussed the issue with Dr. Scollan.  Third, a factfinder does not have to credit the report, particularly if there is contrary evidence.  In

---

[8] On September 1, 2022, while the motion for summary judgment was pending, the court granted the parties' joint motion to extend the discovery completion date to November 28, 2023.

short, this evidence does not itself compel a finding that there was no agreement between Officer Day and Dr. Scollan.

In sum, the court denies the motion for summary judgment as to the § 1983 claims for violations of Brunelle's Fourteenth Amendment rights.

B.     First Amendment

The Elliot Defendants also move for summary judgment on the § 1983 claims under the First Amendment on the grounds that they did not do anything as state actors that violated Brunelle's First Amendment rights.  The Guardian has not provided any explanation as to how its allegations support a theory that the Elliot Defendants violated Brunelle's free speech or other rights protected under the First Amendment.  And the court cannot discern any basis for a First Amendment violation on these facts.  Because there are no facts or allegations indicating that the Elliot Defendants violated Brunelle's First Amendment rights, the court grants summary judgment on those claims.

C.     Eighth Amendment

The Elliot Defendants also move for summary judgment on the § 1983 claims under the Eighth Amendment on the grounds that they did not do anything as state actors that violated Brunelle's Eighth Amendment rights.  The Eighth Amendment only prohibits cruel and unusual punishment after an individual has been convicted of a crime.  Burrell v. Hampshire Cnty., 307 F.3d 1, 7 (1st Cir. 2002).  There are no

facts or allegations in this case that Brunelle was subject to cruel and unusual punishment after having been convicted of a crime.  There are thus no facts or allegations supporting claims under the Eighth Amendment.  Id.  For the same reason, there are no facts or allegations that the Elliot Defendants did anything that resulted in violations of Brunelle's Eighth Amendment rights.  The court therefore grants summary judgment on those claims.

II.    Medical Malpractice

Finally, the Guardian moves for summary judgment on the state-law medical malpractice claims on the sole ground that, if the court dismisses the § 1983 claims, it will lack supplemental jurisdiction over the state-law claims.  See 28 U.S.C. § 1367.  The court, however, has not dismissed all the § 1983 claims.  Accordingly, the court will not grant summary judgment on the medical malpractice claims on this basis.  The court denies the motion with respect to these claims without prejudice.

**CONCLUSION**

For the foregoing reasons, the court denies the Elliot Defendants' motion for summary judgment without prejudice as to the § 1983 claims under the Fourteenth Amendment and the medical malpractice claims.  Doc.

no. 12.  The court grants the motion as to the § 1983 claims under the First

and Eighth Amendments.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

September 20, 2022

cc:  Counsel of Record

21